UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————x

T.S.; S.S.; and R.S.,

                                            Civ. No. 20-8724

                  Plaintiffs,                 **COMPLAINT AND
JURY DEMAND**

         -against-

THE ROCKEFELLER UNIVERSITY
A/K/A ROCKEFELLER UNIVERSITY
HOSPITAL F/K/A THE ROCKEFELLER
INSTITUTE AND THE ROCKEFELLER
INSTITUTE FOR MEDICAL RESEARCH,

               Defendant.
————————————————————————x

        Plaintiffs, by and through their attorneys, Cuti Hecker Wang LLP, for their

Complaint alleges as follows:

## <u>NATURE OF THE ACTION</u>

        1.       Reginald Archibald presented himself as a pediatric endocrinologist with an

interest in childhood growth and maturation.  For almost half a century, he served on the faculty

of what is now called The Rockefeller University ("Rockefeller"), from the 1940s until the

1980s.  During that time, Archibald had unencumbered access to thousands of vulnerable

children on whom he purported to conduct medical examinations in private, in his Rockefeller

office.  In fact, Archibald systematically used Rockefeller's offices and auspices to sexually

abuse hundreds if not thousands of these vulnerable children as part of those medical

examinations.

        2.       Archibald lured children to Rockefeller under the pretext that he could treat them

and make them taller.  Indeed, he provided hormones to numerous patients, for years, for that

purpose.  Once in the examining room, however, Archibald engaged in horrific sexual abuse alongside and in conjunction with his medical examinations.

3.      Archibald fondled the genitals of many of his male patients, often while they sat naked on his lap, purportedly in connection with measurements he wrote up in charts.  He frequently directed his child patients to masturbate themselves to ejaculation, and he participated by stroking and manipulating their genitals even as he took notes or pretended to do so.  He told countless boys that he needed to measure their erect penises, and then fondled and molested them to cause an erection.

4.      Archibald photographed most of his patients naked, including close-up photographs of their genitals, and he directed many boys to pose for photographs while their penises were both flaccid and erect.

5.      All of this occurred in Archibald's Rockefeller medical office or examination room through the use of Rockefeller equipment and with the assistance of Rockefeller staff.

6.      Over the years, Rockefeller knew or should have known that Archibald was sexually abusing patients during their medical examinations because, among other things, it was aware of his inappropriate and unusual practices of isolating children from their parents and examining them naked and alone for lengthy periods of time, received multiple complaints from patients and parents about inappropriate sexual contact, routinely saw or should have seen that children refused to return or abruptly ended "treatment" at their insistence rather than Archibald's, and learned of a District Attorney investigation into Archibald's medical practices. Moreover, the abuse took place repeatedly over decades within the confines of an exclusive private institution at which Archibald interacted regularly with other doctors and staff.

7.       Despite its knowledge of Archibald's abuse and the many warning signs over four decades, Rockefeller did nothing to protect the children who were its patients.  As a result, Archibald's predations went unchallenged for nearly half a century, during which Rockefeller provided him access to a constant supply of child victims.  Hundreds, if not thousands, of lives have been destroyed or irreversibly damaged because of Archibald's sexual abuse and Rockefeller's acts in perpetuating it, including those of Plaintiffs.

## PARTIES

8.       Plaintiff T.S. is an adult male who currently resides in New Jersey.  He was a minor child when Archibald sexually abused him at Rockefeller on one occasion between approximately 1976 and 1978.  T.S. is the brother of Plaintiffs S.S. and R.S.

9.       Plaintiff S.S. is an adult male who currently resides in New Jersey.  He was a minor child when Archibald sexually abused him at Rockefeller on one occasion between approximately 1976 and 1978.

10.       Plaintiff R.S. is an adult male who currently resides in New Jersey.  He was a minor child when Archibald sexually abused him at Rockefeller on one occasion between approximately 1976 and 1978.

11.       Defendant The Rockefeller University, also known as Rockefeller University Hospital and formerly known as The Rockefeller Institute and The Rockefeller Institute for Medical Research, is a New York not-for-profit education institution with its principal place of business in New York County, New York.

12.       At all relevant times, Archibald was an agent, servant, or employee of Defendant Rockefeller, and acting in his capacity as such.

## JURISDICTION AND VENUE

13.     This action arises under New York common law.

14.     The jurisdiction of this Court is predicated upon 28 U.S.C. § 1332 because Plaintiffs are citizens of a different state than Defendant and because the matter in controversy exceeds the sum of seventy-five thousand dollars ($75,000) exclusive of interest and costs.

15.     The acts complained of occurred primarily in the Southern District of New York, and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b)(2).

16.     Venue is also lodged in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) because Rockefeller's principal place of business is in this judicial district.

## JURY DEMAND

17.     Plaintiffs demand a trial by jury.

## FACTS

**Archibald's Career at Rockefeller**

18.     John D. Rockefeller Sr. established his namesake medical research institution in the early twentieth century.  After operating a research center from temporary quarters, The Rockefeller Institute Hospital opened in 1910.  Rockefeller expanded its activities to include graduate education in 1955.  It has continued to operate as a research and educational institution ever since then.

19.     Archibald obtained his medical degree and Ph.D. from the University of Toronto in 1939.

20.     He first worked at Rockefeller as a physician and researcher from 1940-1946.  He left Rockefeller briefly, from 1946-1948, to work as a Professor of Biochemistry at Johns Hopkins University.

21.     Archibald returned to Rockefeller in 1948 and held the positions of professor at Rockefeller University and senior physician at Rockefeller University Hospital from approximately 1948-1980.

22.     Beginning in or about 1980, Archibald became an emeritus professor at Rockefeller.

23.     Archibald continued to treat and abuse patients at Rockefeller for several years after this title change, until at least the mid-1980s.

24.     Archibald's clinical and research focus at Rockefeller purported to be in the area of childhood growth and maturation.

25.     Allegedly in connection with this research, Archibald established a clinic at Rockefeller where he saw pediatric patients with growth or other potentially-endocrinological medical issues.

26.     Archibald gained access to child patients through a variety of sources.  Patients were referred to him by pediatricians throughout the New York metropolitan area; schools and other educational institutions; youth organizations, including Boys' Clubs and summer camps; and relatives and friends of existing patients.

27.     Upon information and belief, Archibald never charged patients for treatment. One of the enticements for children to see him – and especially children from families with limited resources – was access to free medical care.

28.     Archibald specifically targeted children from families in which siblings already were patients.

29.     Once Archibald gained access to a family, he requested that siblings of his initial patient be brought to his clinic for "comparison."  Archibald also saw the cousins of many existing patients.

30.     Upon information and belief, Archibald examined as many as 9,000 patients during his tenure at Rockefeller.

31.     In addition to the patients that Archibald saw at Rockefeller, Archibald's reputation as a physician and scientist at a preeminent research institution provided him access to thousands of other children at various institutions around New York City (especially Boys' Clubs locations, where he effectively served as the in-house doctor and provided routine physicals and other care).

**Archibald's Pattern and Practice of Sexually Abusing His Patients**

32.     Archibald's misconduct varied across patients, and he perpetrated a range of abuses.  But he engaged in certain behaviors repeatedly and developed consistent and unlawful practices that continued throughout his tenure at Rockefeller.

33.     First, Archibald routinely prohibited parents from accompanying their children during examinations.

34.     When parents asked to join their children, or when children asked for their parents to be present, Archibald said no.

35.     Archibald insisted on being alone with patients even when patients were extremely young.

36.     Archibald saw patients in some cases beginning at two years old.

37.     No Plaintiff ever had a parent present during Archibald's examination of the Plaintiff.

38.     Archibald's refusal to allow parents to accompany their children during physical examinations was contrary to medical norms at the time of Archibald's employment at Rockefeller.

39.     Archibald's rule that he would only see patients alone did not serve a legitimate medical purpose.

40.     Upon information and belief, Archibald insisted on seeing patients without anyone else present to enable him to sexually abuse patients without their parents or other Rockefeller employees observing or objecting.

41.     Second, Archibald routinely demanded that his patients disrobe immediately upon entering his examination room, and that they remain naked for the duration of their visits.

42.     Archibald's practice of insisting that patients remain naked throughout their examinations was inconsistent with prevailing medical norms at the time of treatment.

43.     Archibald's practice of instructing patients to remain naked for the duration of their examinations was not medically justified or necessary.

44.     Archibald engaged in this improper and unlawful practice with each Plaintiff.

45.     Third, Archibald spent significant amounts of time with each patient:  usually 30-45 minutes, and sometimes as long as an hour.

46.     Archibald's appointments were longer than the norm for physicians in his field of practice during the relevant time period.

47.     Upon information and belief, Archibald extended his appointments with each patient to allow extra time for sexual abuse and the grooming required to make the abuse possible.  As a result of these three practices – refusing to allow parents to accompany their children during examinations, forcing patients to remain naked throughout examinations, and

spending excessive time with each patient – Archibald spent an inordinate amount of time alone with naked children at Rockefeller.

48.     Fourth, Archibald showed unusual and inappropriate interest in his patients' genitals, and he sexually molested his patients in a variety of ways.

49.     Archibald routinely fondled and manipulated his male patients' genitals for excessive periods of time, even as he "measured" them and noted the measurements in medical charts.

50.     In many cases, he forced boys to fondle or masturbate themselves.

51.     He masturbated boys, or forced boys to masturbate, to the point of ejaculation.

52.     In order to sexually excite his male patients, Archibald kept pornographic and/or other sexual materials in his office, which he gave patients to help them get aroused in his presence.

53.     Archibald touched female patients' breasts and genital areas, and in some cases, inserted his finger into female patients' vaginas.

54.     All of this sexual contact with children's genitalia was contrary to accepted medical practice, abusive, and unlawful.

55.     Fifth, Archibald meticulously photographed and documented his patients' naked bodies.

56.     Archibald watched as naked children stood against a wall or lay on an examination table, and he took repeated, posed photographs of fully exposed children's bodies, including close-up photographs of children's penises or vaginas.

57.     In some instances, including, for example, with Plaintiff T.S., Archibald took photographs of boys' erect penises.

58.     It was not standard practice at the time of Archibald's tenure at Rockefeller for physicians in his field conducting similar examinations or research to take close-up photographs of patients' genitals on a routine basis.

59.     Archibald's practice of taking close-up photographs of patients' genitals was not medically justified.

60.     Archibald's practice of directing patients to pose naked at different angles for photographs was not medically justified.

61.     Rockefeller has been unable to locate the naked photographs that Archibald took during his examinations, despite numerous requests by patients for the photographs.

62.     Upon information and belief, Archibald and Rockefeller did not preserve the photographs with patients' medical records because the photographs did not serve any legitimate medical or research purposes.

63.     Sixth, Archibald routinely limited the information he recorded about examinations in his medical notes to avoid memorializing or documenting his abusive and unlawful behavior.

64.     For example, Archibald routinely told male patients, including Plaintiff S.S., that in order to assess their growth, he needed to compare the length and width of their flaccid penis with the length and width of their erect penis.  But Archibald never recorded such comparisons in his medical notes.

65.     Even when Archibald measured the penis of a male patient while flaccid and erect, he recorded only a single set of measurements, if any, in his notes.

66.     Archibald routinely collected semen from male patients, but he did not contemporaneously record in patients' medical records this semen collection or any semen analysis performed in connection therewith.

67.     Archibald's failure to document his extensive genital manipulation and masturbation of his patients is evidence that the practices served no medical purpose.

68.     Notwithstanding his failure to document certain information, Archibald also engaged in abuse and sought to gratify himself sexually while engaged in other "treatment" about which he did take notes, such as certain measurements of male patients' penises and testicles.

69.     Upon information and belief, other employees and staff at Rockefeller routinely had opportunities to and did in fact observe Archibald's unusual behavior and/or failure to follow any standard of care, but failed to take action to stop his abuse, including without limitation by observing that Archibald was routinely alone with naked children for long periods of time, that he collected semen samples, and/or that he kept pornographic magazines in the office for patients' use.

70.     Upon information and belief, Archibald engaged in abusive practices – including directing patients to remain naked for long periods, fondling and manipulating patients' genitals gratuitously and excessively, and taking close-up photographs of naked patients' genitals – for his own pleasure and sexual gratification.

**Facts Specific to Individual Plaintiffs**

*Archibald's Sexual Abuse of R.S.*

71.     R.S. was a young boy between the ages of approximately six and nine years old when his parents brought him to see Archibald.

72.     R.S. saw Archibald once, in approximately 1976-1978.  Rockefeller has not located medical records for R.S.

73.     R.S. was small for his age, and his parents were concerned about his growth and development.

74.     R.S.'s mother learned from one of her friends that the friend had brought her own children to Rockefeller for examination by Archibald in connection with their growth.  She recommended to R.S.'s mother that she bring R.S. to Rockefeller.

75.     The family that referred R.S. to Archibald drove R.S., his siblings (two brothers and a sister), and his parents to Rockefeller in their family's van.

76.     Upon arriving at Rockefeller, R.S. was taken alone to see Archibald for his examination.

77.     During the examination, which R.S. remembers vividly to this day despite his young age at the time, Archibald directed R.S. to remove all of his clothing.

78.     Archibald took multiple photographs of R.S.'s naked body as R.S. stood naked in Archibald's office.

79.     Archibald fondled and manipulated R.S.'s genitals extensively during his examination.  As a result of the extended stimulation by Archibald, R.S. obtained an erection.

80.     R.S. was confused and scared by his erection, which may have been the first he ever experienced.  Archibald attempted to calm R.S. and assured him that the erection was normal.

81.     R.S. was extremely upset by his encounter with Archibald and cried after his visit. He implored his parents not to make him go back.

82.     R.S. has been profoundly damaged by the abuse, including, without limitation, in the context of intimate relationships.

83.     R.S. continues to suffer emotional and psychological distress and other ongoing consequences as a result of the sexual abuse.

*Archibald's Sexual Abuse of T.S.*

84.     T.S., an older brother of R.S., was brought to see Archibald for comparison along with R.S.

85.     T.S. was approximately eleven to fourteen years old at the time of Archibald's sexual abuse.

86.     T.S. saw Archibald once, in approximately 1976-1978.  Rockefeller has not located medical records for T.S.

87.     T.S. was alone and naked with Archibald for the duration of his examination.

88.     During T.S.'s appointment at Rockefeller, Archibald fondled and manipulated T.S.'s genitals excessively, including T.S.'s penis, testicles, and perineum.

89.     Archibald masturbated T.S. to the point of erection and fondled, measured, and photographed T.S.'s erect penis.

90.     As Archibald fondled and manipulated T.S.'s genitals, he asked T.S. repeatedly whether the molestation felt good.

91.     Archibald fondled T.S. for so long, including while T.S. was erect, that T.S. ejaculated slightly as a result of the genital stimulation.

92.     Archibald took multiple photographs of T.S.'s naked body, including close-up photographs of T.S's genitals and of T.S.'s erect penis.

93.     T.S. was terrified in Archibald's office, and was humiliated and distressed by the sexual abuse.

94.     Archibald greatly exacerbated T.S.'s existing shyness and insecurity, and caused T.S. to be afraid of interacting with females or pursuing intimate relationships.

95.     Archibald caused other significant problems in T.S.'s personal life, including in T.S.'s relationships with his wife and his parents.  The significant harm caused by Archibald continues to have an impact on T.S.'s life.

*Archibald's Sexual Abuse of S.S.*

96.     S.S. is the oldest of the boys in his family.  He went to Rockefeller with his brothers, and was examined by Archibald the same day.

97.     S.S. was approximately fourteen to sixteen years old at the time of Archibald's sexual abuse.

98.     S.S. saw Archibald once, in approximately 1976-1978.  Rockefeller has not located medical records for S.S.

99.     Archibald promptly directed S.S. to undress completely.  S.S. remained naked and alone with Archibald for the duration of his examination.

100.    While Archibald and S.S. were alone in a room, Archibald fondled and manipulated S.S.'s genitals, including by rubbing and stimulating S.S.'s penis, testicles, and perineum.

101.    As Archibald fondled and manipulated S.S.'s genitals, he asked S.S. where the touching felt good, and in particular, where S.S. experienced sensations during orgasms.

102.    Archibald directed S.S. to masturbate in order to achieve an erection and then touched and measured S.S.'s erect penis.

103.    Archibald took multiple naked photographs of S.S.

104.     Archibald directed S.S. to pose at different angles for photographs, including facing forward, sideways, and backwards.

105.     S.S. found his experience at Rockefeller deeply unsettling and upsetting. Archibald caused S.S. to fear for his own children and to be hypervigilant as a parent.

106.     Archibald damaged S.S. emotionally and psychologically in a variety of lasting and ongoing ways, and negatively affected S.S.'s intimate and family relationships.

**Facts Common to All Plaintiffs Regarding Rockefeller's Culpability**

*Rockefeller's Duty of Care to Its Patients*

107.     As a hospital providing medical treatment and care, Rockefeller had a special duty to safeguard the welfare of its patients.

108.     Rockefeller held itself out as a premier research and medical institution offering exceptional care and expertise.

109.     Rockefeller lured families concerned about the growth, development, and health of their children, and induced those families to put their trust in Archibald.

110.     Rockefeller provided Archibald with the premises, offices, and equipment needed to examine patients and hold himself out as a medical doctor.

111.     Plaintiffs were unusually vulnerable and susceptible to abuse.

112.     Plaintiffs were minors at all relevant times.

113.     Plaintiffs lacked the judgment or life experience to recognize or protest when a doctor departed from acceptable medical norms.

114.     Plaintiffs were sexually abused by Archibald before or just after starting puberty. Plaintiffs were sexually innocent and inexperienced, and not alert to the danger of sexual abuse.

115.    Plaintiffs were compelled to see Archibald without their parents or anyone else present during their examinations.  They were left alone to fend for themselves.

116.    Rockefeller knew or should have known that Archibald always examined patients on his own, without a parent, nurse, or other doctor present in the examination room.

117.    By granting Archibald access to vulnerable children for lengthy visits behind closed doors without a parent or other adult chaperone present, Rockefeller assumed a heightened responsibility for its patients, who had limited capacity to provide for their own safety.

*Rockefeller's Knowledge of Archibald's Abuse and Failure to Protect Its Patients*

118.    Rockefeller knew, or should have known, that Archibald posed a danger to his patients.

119.    Rockefeller knew, or should have known, that Archibald had a propensity for sexual abuse.

120.    Rockefeller knew, or should have known, that Archibald saw patients alone and did not let others in the room while he examined naked children.

121.    Rockefeller knew, or should have known, that this practice was improper for intrusive physical examinations of children.  Rockefeller should have required supervision by a second staff member or permitted parents to accompany their children in the examination room.

122.    Upon information and belief, Rockefeller knew that Archibald locked his door when seeing child patients to prevent staff from observing his conduct during examinations.

123.    Upon information and belief, nurses or other doctors occasionally entered Archibald's examination room when patients were naked and being subjected to abuse, and witnessed the abuse take place.

124.    On other occasions, nurses or other Rockefeller staff attempted to enter during examinations, but Archibald rushed to conceal his patients and avoided opening the door to his examination room in a manner that prevented other employees from seeing inside the room.

125.    Upon information and belief, Rockefeller employees knew from these attempts to enter the room that Archibald was trying to hide misconduct.

126.    On May 23, 2019, attorneys hired by Rockefeller from the law firm Debevoise & Plimpton LLP published a report (the "Debevoise Report") into their investigation of Archibald's abuse.

127.    The Debevoise Report confirms that Rockefeller had knowledge of Archibald's wrongdoing for years during his employment as a practicing physician and researcher.

128.    According to the Debevoise Report, Rockefeller was made aware in 1960 that the New York County District Attorney's Office issued a grand jury subpoena for the medical records of two of Archibald's child patients.

129.    A former physician-in-chief at Rockefeller, who held that position from 1960-1974, reported that he "received several complaints, during his tenure, from patients, family members, or staff about Archibald's examinations of patients' genitals."

130.    The physician-in-chief personally harbored doubts about Archibald's approach to taking genital measurements.

131.    When the physician-in-chief questioned Archibald about Archibald's examinations, "Archibald became difficult and less communicative."

132.    Rockefeller employees knew that many patients of Archibald skipped scheduled appointments with little notice and missed their visits to Archibald without explanation.

133.     Patients missed appointments on many occasions because they were terrified of experiencing further sexual abuse and refused to return to Rockefeller.

134.     Parents left messages with Rockefeller employees, or sent letters to Rockefeller that were included in patient files, stating that their children were unhappy with their visits and refused to return.

135.     Upon information and belief, Rockefeller knew from these missed appointments and communications that Archibald was engaged in misconduct with patients.

136.     Rockefeller chose to turn a blind eye to complaints, the grand jury investigation, and the numerous warnings that were apparent over decades concerning Archibald's abuse.

137.     Rockefeller did nothing to protect Plaintiffs and the other vulnerable children who received treatment from Archibald.

138.     Despite multiple warnings, Rockefeller continued to allow Archibald to see patients alone through at least the mid-1980s.

139.     Rockefeller failed to establish, implement, or enforce policies and procedures to protect the health, safety, and welfare of children in its care, and to prevent sexual abuse.

140.     Rockefeller failed to warn Plaintiffs and similarly situated patients about the unreasonable risk posed by Archibald.

*Patient Complaints and Rockefeller's Purported Investigations*

141.     In 1996, Rockefeller received a complaint from a former patient that Archibald engaged in inappropriate sexual conduct during examinations conducted in the 1960s and early 1970s.

142.     Rockefeller's management at the time credited Archibald's denials of the patient's detailed allegations.

143.    Upon information and belief, the only action that Rockefeller took in response to this complaint was to ask Archibald to respond to the patient directly.

144.    In 1998, a patient made an oral complaint to Rockefeller alleging that Archibald sexually abused him approximately twenty years earlier.

145.    Rockefeller has no record of taking action in response to this complaint.

146.    In 2004, a patient complained to Rockefeller that, *inter alia*, Archibald had manipulated his genitals and collected semen years before.

147.    Rockefeller hired Debevoise & Plimpton to investigate the allegations, and the firm concluded as a factual matter that the conduct likely occurred and constituted sexual abuse.

148.    Rockefeller reported the allegations to the federal Office of Human Research Protections, the New York State Office of Professional Medical Conduct, and the New York County District Attorney's Office.

149.    But Rockefeller did not inform patients or the public, despite having known since early in Archibald's tenure that he was engaged in improper and abusive practices.

150.    Rockefeller did not communicate with Archibald's patients about the allegations against him until the fall of 2018.

151.    In 2018, Rockefeller received complaints from at least four patients alleging that Archibald had engaged in sexual misconduct.

152.    In connection with those complaints, Rockefeller retained Debevoise & Plimpton again and sent letters to former patients to conduct an investigation that resulted in the Debevoise Report.

153.    Since 2018, hundreds of survivors have come forward publicly or to Rockefeller (directly or through its attorneys) to share their experiences of sexual abuse by Archibald.

154. Rockefeller could have, but failed to, take steps to prevent this abuse.

**The Timeliness of Plaintiffs' Claims and Allegations Regarding Apportionment**

155. This action is timely because it falls within New York CPLR 214-g and is brought within the revival period set forth in that section. The claims brought herein allege intentional or negligent acts or omissions for physical, psychological, and other injuries suffered as a result of conduct that would constitute sexual offenses as defined in Article 130 of the New York Penal Law and Section 263.05 of the New York Penal Law, and such acts were committed against Plaintiffs when Plaintiffs were less than eighteen years of age.

156. Specifically, the conduct that gives rise to Plaintiffs' claims herein would constitute a violation of, *inter alia*, New York Penal Law Sections 130.55 (Sexual abuse in the third degree) and 263.05 (Use of a child in a sexual performance).

157. Archibald died on May 10, 2007.

158. Archibald's will was probated in Minnesota.

159. Archibald's widow Evelyn Archibald served as representative for his estate. Her appointment terminated on May 12, 2010.

160. Because Archibald died more than thirteen years ago and his estate closed in 2010, Plaintiffs cannot obtain jurisdiction over Archibald or his estate, and Archibald's culpable conduct therefore should not be considered in determining Rockefeller's liability.

161. Rockefeller also is not entitled to protection under CPLR 1601 because of the exclusions set forth in CPLR 1602(2)(iv), 1602(7) and 1602(11).

162. Rockefeller had a non-delegable duty to Plaintiffs, acted with reckless disregard for the safety of others, and acted knowingly or intentionally, and in concert, with Archibald.

## FIRST CAUSE OF ACTION
### (Negligence)

163.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

164.    Rockefeller, by virtue of its employment of Archibald and its special relationship with Plaintiffs as minor children in its care, had the duty and responsibility to provide Plaintiffs with a safe environment and to supervise and control Archibald's actions.

165.    Rockefeller failed to exercise the degree of care that a reasonably prudent person would have exercised under similar circumstances, and failed to supervise and control Archibald.

166.    Rockefeller, having knowledge of, or being put on notice of, the sexual abuse of Plaintiffs and other similarly situated patients by Archibald, had a duty to immediately remove Archibald from contact with Plaintiffs and to report Archibald's misconduct to the appropriate criminal and civil authorities in New York State.

167.    Rockefeller failed to remove Archibald from having contact with Plaintiffs or to report Archibald's conduct to the proper criminal and civil authorities in New York State.

168.    Rockefeller is liable to Plaintiffs for negligence in failing to supervise Archibald, and for retaining Archibald and failing to remove him from contact with Plaintiffs.

169.    Rockefeller is liable to Plaintiffs for failing to exercise reasonable care to protect Plaintiffs from a foreseeable and unreasonable risk of sexual abuse.

170.    Rockefeller's actions and omissions constituted gross negligence and were intended to harm Plaintiffs.

171.    As a direct and proximate result of Rockefeller's negligence, Plaintiffs suffered physical injury and sickness, and emotional and psychological distress arising therefrom.

172.    As a direct and proximate result of Rockefeller's negligence, Plaintiffs sustained damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Battery)

173.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

174.    In committing the acts described above, Archibald intentionally subjected Plaintiffs to bodily contact that was offensive in nature.

175.    At all relevant times, Archibald was an employee of Rockefeller acting within the scope of his employment.  Rockefeller is therefore liable for the batteries committed by Archibald under the doctrine of *respondeat superior*.

176.    As a direct and proximate result of these batteries, Plaintiffs sustained damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A.    Awarding compensatory damages for all physical injuries, and the resulting emotional distress, psychological harm, anxiety, humiliation, physical pain and suffering, family and social disruption, and other harm, in an amount to be determined at trial;

B.    Awarding punitive damages in an amount to be determined at trial;

C.    Awarding pre- and post-judgment interest on all such damages;

D.    Awarding Plaintiffs' attorneys' fees and costs; and

E.      Awarding such other and further relief as this Court may deem just and proper.

DATED:  New York, New York
           October 20, 2020

                                        CUTI HECKER WANG LLP


                                        By: /s/ Mariann Meier Wang
                                            Mariann Meier Wang
                                            Alexander Goldenberg
                                            Alice G. Reiter
                                            305 Broadway, Suite 607
                                            New York, New York 10007
                                            (212) 620-2603
                                            mwang@chwllp.com
                                            agoldenberg@chwllp.com
                                            areiter@chwllp.com

                                            *Attorneys for Plaintiffs*